Cyril James WARRILOW, as Designated Representative of Certain Underwriters at Lloyd's, London, Appellant,

v.

Dink C. NORRELL, et al., Appellees.

No. 13–88–437–CV.

Court of Appeals of Texas, Corpus Christi.

Nov. 16, 1989.

Rehearing Overruled April 12, 1990.

Barry A. Chasnoff, Rick H. Rosenblum, Stephan B. Rogers, Akin, Gump, Strauss, Hauer & Feld, Luther H. Soules, Soules & Wallace, San Antonio, James P. Wallace, Soules & Wallace, Austin, Gaston M. Broyles, Jr., Redford, Wray & Woolsey, Corpus Christi, for appellant.

Van Huseman, Bryan Powers, Paul Dodson, Anthony E. Pletcher, White, Huseman, Pletcher & Powers, Allan R. King, Hunt, Hermansen, McKibben & Barger, Corpus Christi, William W. Kilgarlin, Austin for appellees.

Before NYE, C.J., and KENNEDY and BENAVIDES, JJ.

## OPINION

KENNEDY, Justice.

C.J. Warrilow, a designated representative of certain insurance underwriters at Lloyd's of London (hereinafter referred to as "Warrilow"), appeals from a judgment of $10,963,066.53 awarded to the heirs of Carlton Norrell, appellees, for damages resulting from Warrilow's alleged breach of good faith and fair dealing to its insured, William Kerr. Warrilow further appeals from the award of $8,080.48 for attorney's fees allegedly incurred by appellee, William Kerr. By twenty-five points of error, appellant Warrilow complains of the trial court's judgment. Having found error, we reverse the judgment of the trial court and remand this cause for a new trial.

This suit arose out of a tragic accident. On November 11, 1983, Carlton Norrell was accidentally shot when his friend, William Kerr, dropped a loaded pistol. The three "hunting buddies," Norrell, Kerr, and Wolfe, went deer hunting in Colorado. Upon their arrival, the men rented from Richard Lee, a local hunter and resident of the area, a four-wheel drive vehicle to transport them to and from the hunting fields. Wolfe shot his deer on day five of the hunt. On the last day of the hunt, Norrell shot his deer and secured it to the vehicle; Kerr had not yet shot a deer. That afternoon, the men decided to leave the hunting fields and drive back to Lee's place to return the rented vehicle. According to Kerr, Norrell told him to keep his holster and gun, a 41 magnum pistol, on his hip in case they saw a deer while driving back to Lee's. On the way, the vehicle's left rear tire went flat. Norrell pulled to the side of the road, exited the vehicle, kneeled down, and started removing the lug nuts. Wolfe looked for a jack. Kerr, intending to assist in changing the tire, removed his fully loaded pistol from his belt to place it in the vehicle. Kerr dropped his pistol, and it discharged, shooting Norrell; the bullet entered Norrell's left temple and exited through his right eye. Within a matter of seconds, Michael McLain, a Colorado wildlife field officer, was on the scene. Norrell was transported by ambulance to a hospital and, on November 18, after a week in the hospital, died of his injuries.

Kerr was a member of the National Rifle Association ("NRA"), and as such, was covered under a master policy of insurance, the "Peacemaker" policy. The policy was underwritten by the C.J. Warrilow syndicate, appellant. On February 2, 1984, Warrilow sent a letter denying coverage to Kerr, this being the first of three separate denials.

The "Peacemaker" policy provided coverage for:

(a) bodily injury, or

(b) property damage caused by an occurrence and rising [sic] out of the use by

the Individual Insured Member of fire-arms, bows and arrows or trapping equipment, but only while engaged in the following activities:

(i) Hunting or trapping on public or private land.

The policy excluded:

(k) Bodily Injury or Property Damage arising out of the ownership, mainte-nance, operations, use, loading or un-loading of:

... (ii) Any automobiles.

Warrilow, after receiving a report from a licensed insurance adjuster, James Flem-ing, denied coverage on the basis that the accident did not occur while Kerr was en-gaged in hunting, or alternatively, that it was excluded because it arose out of the maintenance or loading of an automobile.

On April 17, 1984, the Norrells brought suit against Sturm, Ruger & Company, the manufacturer of Kerr's pistol, claiming the company designed and marketed a danger-ously flawed gun that discharges when dropped. Sturm, Ruger thereafter made Kerr a third-party defendant, seeking con-tribution from him. Foremost Insurance Company, the issuer of Kerr's home-owner's policy, found coverage under their policy and hired attorney Allan King to represent Kerr. The suit was settled. The Foremost policy limits of $50,000 were ten-dered to Sturm, Ruger on behalf of Kerr as contribution to a $1,500,000 settlement be-tween Sturm, Ruger and the Norrells. The record reflects, generally, that part of this $50,000 was paid to Allan King in satisfac-tion of his attorney's fees.

On November 15, 1985, the Norrells filed suit against Kerr directly. The evidence of negligence on Kerr's part was substantial. Prior to the accident, he knowingly failed to take advantage of a free program of-fered by Sturm, Ruger to correct the defect in the pistol. Moreover, he failed to use a basic safety practice of keeping an empty chamber under the pistol's hammer, thus preventing an accidental firing. Once again, attorney Allan King represented Kerr. On June 17, 1986, Kerr, following the advice of counsel, consented to the en-try of an agreed judgment against him and in favor of the Norrells for $2,900,000. On June 30, 1986, Allan King negotiated with the Norrells, and the parties entered into an "Equitable Assignment and Covenant Not to Execute" (hereinafter "assign-ment"), whereby the Norrells agreed that execution of the $2,900,000 judgment would not be taken, in return for Kerr's claims and causes of action against both the NRA and Warrilow. The Norrells ob-tained the right to prosecute any causes of action in the name of Kerr only or jointly in the name of Kerr and the Norrells. The record reflects that the assignment recites coverage of up to $1,000,000 under the "Peacemaker" policy. From the doc-uments before us, there is evidence to show that, at the time the assignment took place, both parties erroneously thought the "Peacemaker" policy limit was either $700,-000 or $1,000,000, while in reality, the limit was $100,000.[1]

This appeal arises from the Norrells' sub-sequent suit against the NRA, Warrilow, and Kerr.[2] Prior to submission to the jury, the NRA settled with the Norrells and Kerr, plaintiffs. The jury answered that Kerr's loss was covered and not excluded under the "Peacemaker" policy, that Warri-low intentionally breached its duty of good faith and fair dealing by denying Kerr's claim, that Warrilow was grossly negli-gent, and that the amount of $2,900,000 in the agreed judgment was reasonable. The jury found actual damages to Kerr in the amount of $3,000,000 ($2,900,000 in finan-cial damages and $100,000 in mental an-guish damages), $7,500,000 in punitive damages, and attorney's fees for Allan King, Kerr's counsel. The trial court ren-dered judgment against Warrilow in favor of the Norrells and Kerr in the respective

---

1. This fact raises the possibility that the "Cove-nant Not to Execute" is voidable on the ground of mutual mistake.

2. Although Kerr was a named defendant in the suit, the trial court realigned the parties, treat-ing Kerr as a plaintiff. After reviewing the entire record, it is clear that Kerr was properly placed as a plaintiff during trial, and this Court will refer to Kerr as one of the plaintiffs, ac-cordingly.

amounts of $10,963,066.53 and $8,080.48. Warrilow, the sole appellant, appeals from that judgment.

By its twenty-first point of error, Warrilow contends that the trial court erred when it failed to disqualify Kerr's attorney, Allan King. We agree. Warrilow filed a motion to disqualify counsel in which it asserted two separate grounds for disqualification of King: (1) he was a material fact witness in the case, and (2) he was designated by the plaintiffs as an expert witness in the case. These grounds were reasserted during trial, at which time Warrilow moved for a mistrial. The motion to disqualify and the motion for mistrial were overruled by the trial court.

Disciplinary Rule 5–102(A) provides:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness *on behalf of his client,* he *shall* withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5–101(B)(1) through (4) (emphasis added).[3]

Disciplinary Rule 5–101(B)(1) through (4) provides:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Supreme Court of Texas, Rules Governing the State Bar of Texas, Art. X, § 9 (Vernon 1988).

 The rules governing the State Bar of Texas have the same force and legal effect upon the matters to which they relate as the Texas Rules of Civil Procedure have upon the matters to which they relate. *Cochran v. Cochran,* 333 S.W.2d 635, 640 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.). Furthermore, the Disciplinary Rules, unlike the ethical considerations, are mandatory in character because they establish the minimum level of conduct below which no lawyer can fall. *United Pacific Insurance Co. v. Zardenetta,* 661 S.W.2d 244, 249 (Tex.App.—San Antonio 1983) (orig. proceeding). We must decide whether the trial court abused its discretion by (1) refusing to order the disqualification of attorney King after it was brought to its attention that he would be called to testify as a material witness, or (2) failing to grant a mistrial after attorney King had testified in part as an expert witness.

### Attorney King's testimony as a material fact witness.

Because attorney King was called to testify on behalf of his client, Kerr,[4] with-

---

**3.** DR 5–102(B) states:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness *other than on behalf of his client,* he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client (emphasis added).

We need not determine whether attorney King's testimony was prejudicial to his client; Warrilow's complaint arises from the plaintiffs' calling of attorney King as a witness to testify *on behalf of his client* (Kerr), not Warrilow's calling of attorney King as a witness to testify on behalf of Warrilow (Kerr's adversary) as contemplated by DR 5–102(B). *See Gilbert McClure Enterprises v. Burnett,* 735 S.W.2d 309 (Tex.App.—Dallas 1987) (orig. proceeding); *White v. Culver,* 695 S.W.2d 763 (Tex.App.—El Paso 1985) (orig. proceeding); Wydick, *Trial Counsel as Witness,* 15 U.C.Davis L.Rev. 651, 658–59 (1982).

**4.** There appears to be at least two reasons why attorney King's testimony is given on behalf of his client: (1) by the terms of the "Equitable Assignment and Covenant Not to Execute," Kerr obligated himself to "fully cooperate with counsel ... in the prosecution of such litigation [this suit]," and (2) the potential for rescission of the "Equitable Assignment and Covenant Not to Ex-

drawal was mandatory unless the circumstances in which he testified fell within one of the four exceptions contemplated by DR 5–101(B). The first three exceptions concern uncontested testimony, formalities and legal fees, clearly having no application. Attorney King testified regarding the contents of various documents at issue, such as: a nonwaiver agreement executed between Kerr and Warrilow; the "Peacemaker" policy; and correspondence between himself and Warrilow regarding coverage under the "Peacemaker" policy. Attorney King also testified to conversations and actions taken by Warrilow regarding the denial of coverage. He further testified to the circumstances surrounding the underlying litigation, i.e., the Foremost policy coverage during the Sturm, Ruger lawsuit and the facts related to the entry of the Norrell/Kerr agreed judgment. Attorney King's testimony was material and necessary to the plaintiffs' assertion of a cause of action for breach of good faith and fair dealing by Warrilow. He was called upon to testify about his strategy and what transpired during the settlement negotiations he personally conducted in the underlying causes of action on behalf of Kerr; his testimony was crucial at trial to prove bad faith on the part of Warrilow. *See Zweig v. Safeco Insurance Co. of America,* 125 A.D.2d 205, 509 N.Y.S.2d 320, 321 (N.Y.App.Div.1986). Attorney King's testimony was not a part of the three "black-letter" exceptions to the Disciplinary Rules. *Cf. Audish v. Clajon Gas Co.,* 731 S.W.2d 665, 673 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (where the attorney testified that notice of a hearing was given, and the issue was not contested).

■ The fourth exception, authorizing continued representation if an attorney's withdrawal "would work a substantial hardship on the client because of the dis-

tinctive value of the lawyer ... as counsel in the particular case," likewise has no application. This exception generally contemplates an attorney who has some expertise in a specialized area of law such as patents, and the burden is on the attorney seeking to continue representation to prove distinctiveness. *Supreme Beef Processors, Inc. v. American Consumer Industries, Inc.,* 441 F.Supp. 1064, 1068–69 (N.D.Texas 1977). This case is a relatively straightforward civil case; neither the contested issues nor the factual background are particularly complex, requiring the sort of expertise envisioned by DR 5–101(B)(4). *See, e.g., Groper v. Taff,* 717 F.2d 1415, 1419 (D.C.Cir.1983). Furthermore, attorney King wholly failed to assert any "distinctiveness" regarding his representation of Kerr, and we believe that a change in counsel would have imposed little, if any, hardship upon Kerr.

■ We find that the trial court abused its discretion by failing to disqualify attorney King, as mandated by DR 5–102(A). However, in order to warrant reversal on appeal, rather than on mandamus, the complaining party asserting that the trial court should have disqualified an attorney pursuant to the attorney-witness rule must show that the violation harmed him or caused an improper judgment to be rendered. *Bullock v. Kehoe,* 678 S.W.2d 558, 560 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). With respect to attorney King's testimony as a *material fact witness,* we disapprove of this attorney giving testimony and continuing in his capacity as an advocate in this case.[5] Nevertheless, we find that the trial court's refusal to disqualify was not reasonably calculated to cause the rendition of an improper judgment (Tex.R.App.P. 81(b)(1)); we find no reversible error.

ecute," based upon mutual mistake regarding the amount of coverage under the "Peacemaker" policy, gives both attorney King and Kerr an interest in the Norrells' success during this suit, possibly avoiding an attempt by the Norrells to execute the $2,900,000 agreed judgment.

5. In a *Stowers* case, where an attorney might be a witness to a settlement offer and facts bearing upon an alleged negligent refusal to settle, it is unethical for him to accept employment in the case. State Bar of Texas, Comm. on Interpretation of the Canons of Ethics, Op. 308 (Nov. 1965).

### Attorney King's testimony as an expert witness.

Attorney King's testifying on behalf of the plaintiffs as an expert witness presents a fact situation unprecedented in Texas. While the Disciplinary Rules clearly anticipated the situation where an attorney might testify as a material fact witness, the Rules do not specifically address the problems associated with an attorney allowing himself to be designated as an expert witness and subsequently offering testimony on the ultimate legal issues in the case.

Clearly, DR 5–102(A) is applicable because King was designated as an expert witness and called to testify on behalf of the plaintiffs. Unable to locate Texas legal authority addressing this issue, we turn for authority to a case from a United States District Court in Colorado where an attorney was designated as an expert witness, under surprisingly similar circumstances as the case at bar. In *Federal Deposit Insurance Corporation v. Sierra Resources, Inc.*, 682 F.Supp. 1167 (D.Colo.1987), granting a motion to disqualify, the court held that the jury would be confused and would attribute too much or too little weight to the attorney's important testimony. *Sierra*, 682 F.Supp. at 1170. The jury likely would be unable to adequately distinguish among the attorney's multiple roles, including those of: (1) an expert on the ultimate legal issues; (2) a critical fact witness on the issue of good faith and fair dealing; (3) an attorney responsible for upholding the standards of ethical conduct; and (4) a representative of a party to the suit. *Sierra*, 682 F.Supp. at 1170. The great potential for confusion and prejudice, coupled with the legitimate concern about how the public would perceive the situation, justified disqualification under DR 5–102(A).[6] *Sierra*, 682 F.Supp. at 1171. Furthermore, the court found that an independent expert could provide credible testimony. *Sierra*, 682 F.Supp. at 1171. The court also noted that this was not a situation where the opposing party called the adversary's attorney as a witness in an attempt to rob the opposing counsel of its chosen representative.[7] *Sierra*, 682 F.Supp. at 1172.

The ultimate issues in the case before us follow:

(1) whether the accident was covered under the "Peacemaker" policy, i.e., whether Kerr was "hunting":

(2) whether the accident was excluded under the "Peacemaker" policy, i.e., whether the accident arose out of the maintenance or loading of the automobile;

(3) whether Warrilow, by denying coverage under the policy, intentionally breached its duty of good faith and fair dealing to its insured, William Kerr;

(4) whether Warrilow's conduct constituted a conscious disregard for the rights and welfare of its insured, William Kerr;

---

6. Although Texas courts have enumerated several reasons for the disqualification of a testifying attorney, the following policy reasons have been exclusively applied to situations where the attorney testifies as a material fact witness: (1) the attorney may be more impeachable for interest and, therefore, a less effective witness; (2) the attorney's role as an advocate may handicap the opposing counsel in challenging the credibility of the testifying advocate; (3) it may place the testifying advocate in the unseemly and ineffective position of arguing his own credibility; and (4) the roles of advocate and witness are inconsistent, because the function of an advocate is to advance his client's cause and that of a witness is to state facts objectively. *Bert Wheeler's, Inc. v. Ruffino*, 666 S.W.2d 510, 513 (Tex.App.— Houston [1st Dist.] 1983) (orig. proceeding). Applying these considerations, it appears from both the record at trial and the verdict of the jury that reason "(1)" is not applicable to King's testimony. King was not a less effective witness; quite the contrary, we are of the opinion that reasons (2) through (4) warrant reversal of this case.

7. Clearly, that is the rationale behind Disciplinary Rule 5–102(B)'s requirement that the movant make a showing that the testimony of the attorney may prejudice the testifying attorney's client. Disqualification under DR 5–102(B) is more stringent than disqualification under DR 5–102(A) because a litigant may call his or her opponent's attorney as a trial tactic, seeking to disqualify the attorney from the case. *Jones v. City of Chicago*, 610 F.Supp. 350, 360 n. 3 (N.D. Ill.1984).

(5) whether the $2,900,000 agreed judgment was reasonable under the circumstances;

(6) what sum of money, if any, would be appropriate to set an example for the good of the public and to deter the commission of similar alleged wrongs of Warrilow.

Attorney King testified, *based upon his experience as a hunter and a former insurance claims adjuster*, as follows:

(1) "It is my opinion at the time the incidents occurred, Mr. Kerr was in the act of hunting. * * * That there was coverage without question under the Peacemaker policy...."

(2) "It is my opinion that the incident did not arise out of the maintenance of the Toyota Landcruiser. * * * It is my opinion that the accident did not arise out of the automobile at all."

(3) In response to the following question by plaintiffs' counsel, "Let me ask you if you have an opinion whether or not Lloyd's [Warrilow] intentionally refused to deal with Mr. Kerr fairly and in good faith in the entire claims handling of this matter? [sic], " attorney King responded, "There's no doubt that they did."

(4) "I think the correspondence that went between the claims agents and Lloyd's [Warrilow], compared to what they were telling their adjuster in the field, and telling that adjuster to transmit to Mr. Kerr, indicates that they were consciously indifferent to Mr. Kerr's rights, and that they were— that constitutes gross negligence."

(5) "That that [sic] [the $2,900,000 agreed judgment] was a reasonable amount."

(6) "Given the size of the organization's monitary [sic]—financial size of the organization, the only way to get its attention is by assessing some penalty against them in the form of dollars, and that's got to be high dollars, not something minimal. * * * In this case it will take millions of dollars to get their attention."

It would have been extremely difficult for the jury to separate what attorney King said as an advocate from what he said as an expert witness. To illustrate these difficulties, we need only turn to his own words when testifying in front of the jury, "My response, Your Honor, is that—it's difficult to separate my response as a lawyer here on behalf of Mr. Kerr, and my testimony, because I think they're one and the same." When plaintiffs' counsel passed him as a witness, attorney King stated, again from the witness stand, "I don't have any questions for myself, Your Honor." Finally, during cross-examination when defense counsel moved to admit a document, attorney King stated, from the witness stand, "I have no objection." Compounding the problem of jury confusion is the fact that attorney King participated actively throughout the trial: examining witnesses, addressing the court, and arguing to the jury. *Cf. Callen v. Gill*, 7 N.J. 312, 81 A.2d 495, 497 (1951) (where the attorney did not participate actively in the proceedings and did not examine witnesses or address the court).

Another problem associated with this type of testimony is the attorney-witness vouching for his own credibility when summing up to the jury; it is unfair to opposing counsel. *Jones v. City of Chicago*, 610 F.Supp. 350, 357 (N.D.Ill.1984). Moreover, it puts the attorney-witness in the unseemly position of arguing his own credibility. *Zardenetta*, 661 S.W.2d at 247–48. Unquestionably, a principal ethical consideration underlying this Disciplinary Rule is that the attorney-witness is put in the unseemly position of arguing his own credibility to the jury. *See Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 418 n. 9 (7th Cir.1988); *Groper*, 717 F.2d at 1418. Attorney King stated, during jury argument, "That's why *I testified* that the NRA should have provided notice. *I wasn't the only one.* Mr. Swantner testified NRA [sic] should have given notice through the mail, just like they sent out the policy. *I wasn't the only one* (emphasis added)."

An additional consideration justifying the prohibition occurs when the trier of fact,

especially a jury, grants undue weight to the attorney's testimony; his opponent is unfairly disadvantaged. *Jones,* 610 F.Supp. at 357. Attorney King, as an expert witness, made a good impression upon the jury. "[A]n adversary may be harmed if your role as trial counsel makes you *too* effective as a witness: the trier of fact may be dazzled by your performance as advocate and thus give undue credence to your words from the witness stand." Wydick, *Trial Counsel as Witness,* 15 U.C.D. L.Rev. 651, 662 (1982).

A party is prejudiced when opposing counsel acts as both advocate and witness, and this conduct becomes intolerable when the attorney-witness fails to show that he has attempted to contact others who might act as an expert witness and found them lacking in knowledge of the relevant area of insurance. *See Security General Life Insurance v. Superior Court,* 718 P.2d 985, 989 (Ariz.1986). Attorney King's expert testimony went to the merits of the case and could have been substituted from other sources.[8]

■ The rule of disqualification involves a balancing of the likelihood of public suspicion against the interest in retaining counsel of one's choice. *Cossette v. County Style Donuts, Inc.,* 647 F.2d 526, 530 (5th Cir.1981). When the client's right to counsel of his choice and the need to maintain ethical standards of professional responsibility clash, "[T]he preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount ..." and "[The client's recognizably important right to counsel of his choice] must yield, however, to considerations of ethics which run to the very integrity of the judicial process." *Zardenetta,* 661 S.W.2d at 248, *quoting, Hull v.*

*Celanese Corp.,* 513 F.2d 568, 572 (2d Cir. 1975). There exists a broader concern for public confidence in the administration of justice—"justice must satisfy the appearance of justice." *Jones,* 610 F.Supp. at 357.

■ To put things in perspective, the statement of facts shows that the presentation of the testimony of the plaintiffs' seven witnesses covers approximately 1090 pages. Attorney King's testimony alone comprises approximately 341 pages, nearly one third of all the testimony adduced in the presentation of the plaintiffs' case. As we pointed out when discussing attorney King's testimony as a material fact witness, the failure of the trial court to disqualify attorney King and the failure of the trial court to grant Warrilow's motion for mistrial must have caused an improper judgment to be rendered, thus requiring us to reverse *(Bullock,* 678 S.W.2d at 560) and remand for a new trial.[9] We have reviewed the entire statement of facts and find that the improper admission of attorney King's testimony was calculated to cause and probably did cause the rendition of an improper judgment. In so holding, we expressly disapprove of attorney King's failure to voluntarily withdraw as trial counsel,[10] and we find that the trial court abused its discretion by failing to order his withdrawal and by failing to grant Warrilow's motion for mistrial when the nature of attorney King's testimony became apparent.

"The practice of attorneys furnishing from their own lips and on their own oaths the controlling testimony for their client is one not to be condoned by judicial silence * * * nothing short of actual corruption can more surely discredit the profession." *Ferraro v. Taylor,* 197 Minn. 5, 265 N.W.

**8.** Indeed, the plaintiffs called Mr. Richard Swanter to testify as an expert witness regarding insurance industry procedures, making it abundantly clear that adequate expert testimony was available.

**9.** The remedy for violation of the witness-advocate rule is reversal and remand for a new trial. *See generally Cheatham v. Franke,* 298 S.W.2d 202 (Tex.Civ.App.—Austin 1957), *rev'd on other grounds,* 157 Tex. 397, 303 S.W.2d 355 (1957).

**10.** When trial counsel foresees the possibility that he will testify on behalf of his client at trial, he should resolve any doubt in favor of preserving the integrity of his testimony and against his continued participation as trial counsel. *Comden v. Superior Court,* 20 Cal.3d 906, 145 Cal. Rptr. 9, 576 P.2d 971, 975 (1978) (en banc), *cert. denied,* 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 652 (1978).

829, 833 (1936). Warrilow's twenty-first point of error is sustained.[11]

When the trial court's judgment must be reversed, it is the duty of this Court to render the proper judgment, except when it is necessary to remand for further proceedings. Tex.R.App.P. 81(c). Consequently, we must address Warrilow's points of error which could result in our reversing and rendering judgment in this case. The appropriate points of error for our inquiry are those that complain of the absence of legally sufficient evidence on vital jury findings. *See Yarbrough v. Booher*, 141 Tex. 420, 174 S.W.2d 47 (1943).

By points of error one and two, Warrilow contends that the evidence was legally insufficient to establish the accident as a covered loss under the "Peacemaker" policy, i.e., Warrilow contends that, as a matter of law, Kerr was not engaged in hunting. Likewise, by points of error three and four, Warrilow asserts that the evidence was legally insufficient to show that the accident was *not excluded* under the "Peacemaker" policy, i.e., Warrilow contends that, as a matter of law, Kerr was maintaining or loading the vehicle. Finally, by point of error eight, Warrilow claims that the plaintiffs failed to meet their burden of proof, essentially arguing that the plaintiffs failed to obtain necessary fact findings on the above issues.

### *Coverage under the "Peacemaker" policy.*

As the trier of fact, the jury found that the accident occurred while Kerr was "engaged in hunting." The policy does not contain a definition of "hunting." Both parties argue that the term "hunting" has a plain and generally accepted meaning, but they are at opposite poles as to what that meaning is. *Cf. Standard Fire Insurance Co. v. Griggs*, 567 S.W.2d 60 (Tex.Civ. App.—Amarillo 1978, writ ref'd n.r.e.) (where the parties agreed on the meaning of the word "jewelry," and the uncertainty

was created by application of the meaning to the facts of the case). Neither party has presented a Texas case that bears directly on the question, and we have found none.

The plaintiffs contend that "hunting" includes travel to and from the hunting fields, while Warrilow contends that "hunting" is limited to the actual pursuit of game. We have concluded that both parties have offered reasonable, although conflicting, interpretations of the meaning of "hunting" as applied to the facts and circumstances of this case. The term is not ambiguous, in and of itself, but uncertainty arises when the term is applied to the facts of the case. *See Ramsay v. Maryland American General Insurance Company*, 533 S.W.2d 344 (Tex.1976). When the language of a policy is susceptible of more than one reasonable construction, it is patently ambiguous, and the courts will apply the construction which favors the insured and permits recovery. *See Glover v. National Insurance Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). Although a successful argument could have been made that the term "hunting" should have been defined by the trial court rather than submitted for the jury's determination, such argument was not advanced at trial. We see no error in the jury's finding that the accident was covered under the policy; the same result would have been reached if the trial court assigned a meaning to the term "hunting," as it would have been required to construe that term strictly against the insurer and liberally in favor of the insured. *See Barnett v. Aetna Life Insurance Co.*, 723 S.W.2d 663, 666 (Tex.1987). The objective of an insurance policy is to insure; courts should not construe policies otherwise unless the language clearly requires it. *Goswick v. Employers' Casualty Co.*, 440 S.W.2d 287, 289 (Tex.1969). Warrilow's points of error one and two are overruled.

---

**11.** January 1, 1990, the new Texas Disciplinary Rules of Professional Conduct become effective. Although our decision today is based upon an application of the current Texas Code of Professional Responsibility—Disciplinary Rule 5– 102(A), we would have reached the same result under the new Disciplinary Rule 3.08(a) because the standard of conduct for a lawyer testifying on behalf of his client has not been materially altered by the new rule.

### Exclusion under the "Peacemaker" policy.

The jury found that the accident was not excluded from coverage under the "Peacemaker" policy—that the accident did not arise out of the maintenance or loading of the vehicle. Warrilow asserts that the accident arose out of the maintenance (changing a tire) and the loading of the vehicle (Kerr's intent to place his pistol in the vehicle after removing it from his hip). On the other hand, the plaintiffs claim that the accident arose out of Kerr's negligence [12] and was entirely disconnected from the maintenance or loading of a vehicle, essentially that the excluded conduct had no casual relationship to the accident. Thus, we have a situation where both parties claim the accident arose out of at least two different activities, Warrilow asserting maintenance or loading of the vehicle and the plaintiffs asserting Kerr's negligence.

Warrilow cites two Texas cases for the proposition that injuries which would not have occurred "but for" an excluded activity, "arise out of" the excluded activity. In *Dorsey v. Fidelity Union Casualty Co.*, 52 S.W.2d 775 (Tex.Civ.App.—Waco 1932, writ dism'd by agr.), the insured was injured when his companion, before entering an automobile and for the purpose of preparing his gun to be loaded into a car, undertook to remove the shells therefrom, and in his doing so, the gun accidentally discharged, shooting the insured. The policy insured against injuries sustained *as the result of* operating or riding in a car. The court held that the removing of the shells was so closely connected with the loading into the car as to constitute a part thereof. Thus, no negligence apart from the loading of the car was shown; there was no claim of multiple causation. Moreover, the court was interpreting the *coverage* section of the policy, expressly following the rule that policies are construed against the insurance company.

Likewise, in *Travelers Insurance Co. v. Employers Casualty Co.*, 380 S.W.2d 610 (Tex.1964), the *coverage* provision of the policy in question included accidents arising out of the loading and unloading of the vehicle. The injury occurred when concrete was being unloaded from a truck by means of a bucket attached to a crane. While moving a full bucket, the crane collapsed, killing three men. The Court held that the accident resulted from the collapse of the crane which was transporting concrete from the truck and that, as a matter of law, the injury arose out of the unloading of the vehicle. The bottom line: in this case, as in *Dorsey*, the construction of a *coverage* section of an insurance policy was involved, not the interpretation of an *exclusion* clause, and the Court found in favor of the insured and against the insurance company.

■ Warrilow urges us to apply the law of these cases to the facts at hand. We cannot. It is important to recognize different rules of construction governing the interpretation of policy provisions which extend coverage as opposed to policy provisions which exclude coverage. When a case involves an exception or limitation to an insurer's liability under a policy, a more stringent construction against the insurer is required than a case involving a coverage provision. *Barnett*, 723 S.W.2d at 666; *see also Glover*, 545 S.W.2d at 761. If we failed to properly distinguish Warrilow's cases on the basis that they involved *coverage* provisions and not *exclusion* provisions, we would be reading the "Peacemaker" exclusion provision in favor of the insurance company and against the insured, clearly against well-settled legal principles. Warrilow has cited no Texas authority involving a claim of multiple causation where an exclusion provision is construed in favor of the insurer. Unable to locate Texas authority, we turn to other jurisdictions for guidance.

The leading case involving concurrent causation and construction of an exclusionary provision of a liability insurance policy is *State Farm Mutual Insurance Co. v.*

---

**12.** It is undisputed that Kerr knowingly failed to take advantage of a free program offered by Sturm, Ruger to correct the defect in the pistol and that he failed to use a basic safety practice of keeping an empty chamber under the pistol's hammer.

*Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973). In that case, the insured was hunting rabbits by shooting out of the window of his moving vehicle. The insured had filed the trigger mechanism of his .357 magnum pistol, giving it a "hair trigger." Upon spotting a rabbit, the insured chased it by driving off the road. During the chase, the vehicle hit a bump, the pistol discharged, and a passenger was shot. One of the insurance policies at issue contained a clause excluding bodily injury arising out of the ownership, maintenance, operation, use, loading and unloading of any motor vehicle. The California Supreme Court, declining to predicate its decision on the ambiguity of the exclusionary clause, held that the injury had two joint causes: one arising from the negligent operation of the automobile and the other arising from the negligent tampering with the firing mechanism of the pistol. In the context of third-party liability insurance, the Court held that the policy did not exclude coverage for the shooting accident. "That multiple causes may have effectuated the loss does not negate any single cause; that multiple acts concurred in the infliction of injury does not nullify any single contributory act." *Partridge*, 109 Cal.Rptr. at 818–19, 514 P.2d at 130–31.

Other courts have adopted this rationale in finding coverage for similar accidents. In *Travelers Insurance Co. v. Aetna Casualty and Surety Co.*, 491 S.W.2d 363 (Tenn.1973), the injury occurred when a shotgun accidentally discharged while being placed inside an automobile. The Court held that for a policy to exclude coverage because of the use, loading or unloading of an automobile, that use, loading or unloading must be the efficient and predominating cause in the strict sense of those terms. *Aetna*, 491 S.W.2d at 367–68.

■ In *Glen Falls Insurance Co. v. Rich*, 49 Cal.App.3d 390, 122 Cal.Rptr. 696 (1975), the insured placed a loaded gun under the seat of his car. When he spotted a squirrel, he stopped the car, reached under his seat for the shotgun, and it fired, injuring a passenger. The policy excluded coverage for injury arising out of the ownership, maintenance, operation, use, loading or unloading of any motor vehicle. The court reasoned that the injury was covered if the accident arose solely out of a non-automobile related cause or from a non-automobile related cause concurrent with any cause arising from the use of an automobile, while noting that, coverage would not be afforded if the accident arose solely out of the use of an automobile. *Glen Falls*, 122 Cal.Rptr. at 699.

Finally, in *State Capital Insurance v. Nationwide Mutual Insurance*, 318 N.C. 534, 350 S.E.2d 66 (1986), while removing a rifle out of his vehicle, the insured accidentally shot a passenger. The insured's policy excluded injury arising out of the ownership, maintenance, use, loading or unloading of any motor vehicle. The Court summarized the principles involved with respect to exclusionary provisions of this nature: (1) ambiguous terms and standards of causation in exclusion provisions must be strictly construed against the insurer, and (2) coverage is provided so long as a nonexcluded cause is either the sole or concurrent cause of the injury giving rise to liability. *Nationwide*, 350 S.E.2d at 73.

■ Applying these principles to the present case, Kerr's liability could be based on a finding that both the negligent failure to have the defective gun repaired and the negligent failure to keep an empty chamber under the hammer were the proximate causes of Carlton Norrell's death. Kerr's choice of placing his pistol in the vehicle was mere happenstance; he could have easily set it down in any number of places. We decline to hold that the accident was excluded under the policy because, as Warrilow urges, it arose out of the loading of the vehicle. With respect to Warrilow's assertion that the accident arose out of the maintenance of the vehicle, we reach the same conclusion for the same reasons. The changing of a tire was mere happenstance. *Cf. Queen Insurance Co. of America v. Creacy*, 456 S.W.2d 538 (Tex. Civ.App.—San Antonio 1970, no writ) (where an accident *arose out of* maintenance—the insured reached down to jiggle a stuck accelerator pedal, the car lurched

forward and pinned a person between the automobile and a building).

Warrilow's third, fourth and eighth points of error are overruled. The judgment of the trial court is REVERSED, and this cause is REMANDED for a new trial.

## OPINION ON MOTION FOR REHEARING

On its motion for rehearing, appellant Warrilow contends that established Texas law does not permit our adoption of the concurrent causation doctrine of *Partridge.* We disagree. Warrilow cites three Texas cases in support of its argument.[1] These cases involve property loss coverage under first-party insurance policies and are distinguishable from both the facts of *Partridge* and the facts of the case at bar.

*Partridge* did not involve first-party property insurance coverage; it involved third-party liability insurance coverage.[2] *Partridge* never considered in what manner concurrent causation might apply to first-party property insurance disputes, and its holding was not extended to that context.

### The Distinction Between Liability and Property Insurance

Warrilow fails to differentiate between property loss coverage under a first-party insurance policy, typically an all-risk homeowner's policy, and tort liability coverage under a third-party insurance policy, as the Peacemaker policy in the present case. This distinction is critical. The California Supreme Court recently elaborated on its *Partridge* rationale, "Liability and corresponding coverage under a third-party insurance policy must be carefully distinguished from the coverage analysis applied in a first-party property contract. Property insurance, unlike liability insurance, is unconcerned with establishing negligence or otherwise assessing tort liability." *Gar-*

*vey v. State Farm Fire and Casualty Co.,* 48 Cal.3d 395, 257 Cal.Rptr. 292, 298, 770 P.2d 704, 710 (1989) (citation omitted).

Coverage in a property policy is commonly provided by reference to causation, such as "loss caused by ..." certain enumerated forces. *Garvey,* 257 Cal.Rptr. at 298, 770 P.2d at 710. It is precisely these physical forces that bring about the loss. *Id.* Frequently, as in the cases cited to us by Warrilow, *property* losses occur from more than one legally significant physical force: poultry house destroyed by wind and snow in *McKillip;* home rendered uninhabitable by contamination and an exterminator's negligence in *Auten,* and building damaged by rain and wind in *Matchoolian.* In Texas, if one force is covered and one force is excluded, the insured must show that the property damage was caused solely by the insured *force,* or he must separate the damage caused by the insured peril from that caused by the excluded peril. *McKillip,* 469 S.W.2d at 162. The coverage analysis in the property insurance context examines the relationship between perils, those that are covered under the policy and those that are excluded, focusing on the exclusions that limit loss coverage. *Garvey,* 257 Cal.Rptr. at 298, 770 P.2d at 710.

The *Partridge* rationale is not proper in the first-party property insurance context because, in most cases, the insured can point to some arguably covered contributing factor. *Garvey,* 257 Cal.Rptr. at 299, 770 P.2d at 711. The presence of such a cause, regardless of how minor, would give rise to coverage under *Partridge. Id.* The reasonable expectations of the parties would not be served when the efficient and predominating cause of the loss is expressly excluded by the terms of the policy, and nevertheless, coverage is extended.

1. *Travelers Indemnity Co. v. McKillip,* 469 S.W.2d 160 (Tex.1971); *Auten v. Employers National Insurance Co.,* 722 S.W.2d 468 (Tex.App. —Dallas 1986), *writ denied,* 749 S.W.2d 497 (Tex.1988); *United States Fire Insurance Co. v. Matchoolian,* 583 S.W.2d 692 (Tex.Civ.App.— Houston [14th Dist.] 1979, writ ref'd n.r.e.).

2. In first-party insurance coverage, the insured is covered for his own loss. In third-party insurance coverage, the insured is covered for his liability to another for their loss.

■ Conversely, in the third-party liability insurance context, the right to coverage is established by traditional tort concepts of fault, proximate cause, and duty. *Garvey*, 257 Cal.Rptr. at 298, 770 P.2d at 710. By insuring for personal liability and agreeing to cover the insured for his own negligence, the insurer agrees to cover the insured for a broader spectrum of risks. *Id.* Thus, the focus is on the insured's legal obligation to pay for an injury or damage arising out of a certain occurrence, and coverage should extend to an insured risk, negligence, which constitutes a concurrent proximate cause of the injury. *Id.* By finding coverage for an injury resulting from the insured's negligence, the reasonable expectations of the parties to the insurance contract are not frustrated. Our application of *Partridge* does not expand the insurer's potential liability, as would be the case in the first-party property insurance context.

The cases cited to us by Warrilow involve disputes over first-party property insurance coverage. In the case at bar, the dispute is over third-party liability insurance coverage. We believe the distinction is necessary and appropriate. Both appellant's and appellees' motions for rehearing are OVERRULED.

NYE, C.J., concurs.

NYE, Chief Justice, concurring.

I respectfully concur in the result reached by the majority. I agree with the majority's position that attorney Allen King's conduct is reprehensible; however, I would not reverse and remand the case for that reason. I would, however, reverse and remand this case relying on appellant's second point of error, i.e., that the evidence is factually insufficient to show that William Kerr's claim was covered under the subject insurance policy.

Special Issue Question No. 1 asked, "Was the accident in question a covered loss and not excluded under the 1983 policy?" The jury answered in the affirmative. The majority upheld the jury's finding on these two issues. Before a court of appeals can set aside a jury's determination of fact, it must consider and weigh all the evidence supporting and contrary to the jury's determination. *Sosa v. City of Balch Springs*, 772 S.W.2d 71, 72 (Tex. 1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). The proper standard of review requires a court of appeals to consider, weigh and compare all the evidence in the record pertinent to the issue under consideration and articulate why the original finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Sosa*, 772 S.W.2d at 72; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). In other words, when reversing a trial court's judgment after concluding the supporting evidence is insufficient, the court of appeals must detail the relevant evidence and clearly state why the evidence is factually insufficient. *INA of Texas v. Briscoe*, 780 S.W.2d 786 (Tex. 1989). A court of appeals' conclusion that additional or better evidence might have been presented on the issue under consideration is not a substitute for the analysis required by *Pool*. *Sosa*, 772 S.W.2d at 72.

The "NATIONAL RIFLE ASSOCIATION MASTER INSURANCE POLICY" providing Kerr's coverage stated, in relevant part:

> II. COVERAGE. The underwriters will pay on behalf of the Individual Insured Member all sums which the Individual Insured Member shall become legally obligated to pay as damages, all as hereinafter defined as included within the terms, "ultimate net loss", *excess*[1] over and above any other valid and collectible insurance, because of
> (a) bodily injury,
>
> . . . . .
>
> caused by an occurrence and rising out of the use by the Individual Insured Member of firearms, ... but only while engaged in the following activities:
> (i) Hunting or trapping on public or private land.

---

**1.** Emphasis in original.

The evidentiary facts show that Carlton Norrell, William Kerr and A.T. Wolfe went deer hunting. They rented a vehicle from Richard Lee which they used to drive to and from the hunting fields. On the last hunting day, they decided to leave the hunting fields and return the vehicle. According to Kerr, Norrell told him to keep his holster and gun on his hip in case they saw a deer on the way back. On the way back, they had a flat tire. Norrell started changing the tire. Kerr, intending to assist Norrell, removed his pistol from his belt in order to place it inside the vehicle. Kerr dropped the pistol. It discharged, killing Norrell.

Michael Holland, the designated representative of the C.J. Warrilow syndicate, testified that in his opinion, intent is a major consideration in determining whether a person is hunting. He also said that the person alleged to be hunting is in the best position to say whether or not he was actually hunting.

On the day of the incident, Kerr (the person who dropped the pistol) gave a statement to Officer Chaffin. Kerr stated, "[W]e just decided that this being the last day of this season, we'd give it up and go on home.... just quit for the ... year.... [W]e got into the Jeep and started home." During trial, Kerr testified that their hunt would have continued until their arrival at Lee's; however, he also said that while leaving the hunting fields, they got on a road and drove four or five miles to a gate. Once they passed through this gate, and continued to Lee's place, permission to hunt would be required. Kerr did not have permission to hunt in this area and would not have shot anything without it. The incident occurred after all of the men had passed through this gate. Kerr admitted that at the time of the incident, he was not looking for something to shoot; rather, he was concentrating on placing his pistol inside the vehicle and changing the tire.

Michael McLain, a field officer with the Colorado Division of Wildlife, arrived at the scene within minutes of the incident. Kerr told McLain the details of the incident. McLain testified that there was no indication of hunting. McLain also filled out an accident report. The report asked whether the victim (Norrell) was hunting. Officer McLain indicated that he was not. McLain based his answer on his discussions with Kerr and Wolfe. He also based his answer on the fact that the incident occurred on a paved road surrounded by private property. McLain testified that they would have needed permission to hunt on the adjoining private property.

The pertinent language in the policy indicates that Kerr enjoyed coverage "only while engaged in" hunting. Our Legislature has said that "hunt" "includes take, kill, pursue, trap, and the attempt to take, kill, or trap." Tex.Parks & Wild.Code Ann. § 61.005(1) (Vernon 1976). In the instant case, all of the circumstances indicate that prior to and during the incident, actual hunting had ceased and the men were now on a different mission, i.e., returning the rented vehicle to Mr. Lee. Having examined all of the evidence, I would conclude that the greater weight and preponderance of all the credible evidence is that William Kerr was not engaged in hunting at the time of the incident. I would grant a new trial on this issue.

The majority sustained point of error twenty-one and held that the trial court abused its discretion "by failing to order his [attorney King's] withdrawal and by failing to grant Warrilow's motion for mistrial when the nature of attorney King's testimony [as an expert witness] became apparent." There is no question that King violated the ethical provisions of Disciplinary Rule 5–102[A] and the exceptions stated in Disciplinary Rule 5–101[B][1]–[4]. *See* Tex.Gov't Code Ann. Title II, Subtitle G (Vernon 1988).[2] These rules were enacted to protect the clients of attorneys and the public in general from the intentional wrongdoing and/or mistakes of attorneys. *Quintero v. Jim Walter Homes, Inc.*, 709

---

2. *See also* Tex.Gov't Code Ann. Title II, Subtitle G, Rules 1.15 and Rule 3.08 (Vernon Supp.

1990).

S.W.2d 225, 232 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). Breaches of these rules result in the attorney receiving private or public reprimand, suspension, or disbarment. These remedies are uniquely appropriate because they prevent the client from suffering any further mistreatment due to counsel's ethical misconduct.

I do not believe, however, that King's conduct warrants reversal of the trial court's judgment. Professor John F. Sutton, Jr., in his article *The Testifying Advocate,* 41 Texas L.Rev. 477 (1963), stated, relevant to this discussion, that:

> The advocate's interest—occasioned by his fee or merely by an advocate's partisan instinct—in seeing his client prevail lessens, not strengthens, his credibility and the weight of his testimony. Whenever a lawyer's testimony is given unusual weight by a particular jury or judge, the lawyer's demeanor and his standing in the community and similar factors are likely responsible. The circumstance that he is both advocate and witness does not itself enhance his standing as a witness or make his advocacy more appealing. The appearance of a particular lawyer as either a witness or an advocate may be influential with judge and jury, by reason of reputation or personal magnetism, but it is difficult to see how the fact that he simultaneously appears as both could increase his influence on the trier of fact. [footnote omitted]

Apparently, the majority fears that King, by acting as both witness and advocate, somehow enhanced his standing as a witness, and by reversing the judgment on this point, they obviously assume that the jury lacked the intelligence to consider and weigh the effect of King's interest in the case. An interested witness' testimony need not be prohibited, because a jury can and will weigh the effect of the interest. *Seaboalt v. Vandaveer,* 231 S.W.2d 665, 667 (Tex.Civ.App.—Eastland 1950, writ ref'd n.r.e.). In the present case, King's partisan interest is so keenly evident that even the most unsophisticated jury would, could, and in this case did consider his testimony in light of his allegiance to his client's position.

Furthermore, the testifying advocate is more easily impeachable because of the interest he may have as an advocate in the outcome of his client's case. In *Wilson v. Wilson,* 89 Neb. 749, 132 N.W. 401 (1911), an attorney, who was the defendant wife's principal witness in a divorce action, appeared as her divorce counsel. The Nebraska Supreme Court criticized the attorney's conduct, saying that his dual role as witness-advocate "is against the ethics of the legal profession, is unseemly, and no doubt *weakens* the defendant's case. (Emphasis added.) *Wilson,* 132 N.W. at 404.

In any given case, the trier of facts may be justified in giving little weight to a witness-advocate's testimony. Many factors affect the weight of a witness' testimony, however, and the question of weight of evidence usually is best left to the trier of facts. *Seaboalt,* 231 S.W.2d at 667. In the present appeal, the record does not reflect, and appellants fail to argue, that King's testimony was untruthful or lacking in credibility. Appellants certainly had the opportunity to expose any weaknesses in King's testimony in a thorough cross-examination. In the present case, King's dual role did not, as such, cause the rendition of an improper judgment. The majority does not refer to the record to show where or how cross-examining King handicapped defense counsel. I note that when a retrial occurs, King will still be an expert witness and, perhaps, an attorney even though he may or may not serve again as Kerr's trial counsel. Retrial will not make defense counsel's opportunity to impeach King's testimony any easier. The majority's opinion as it now stands punishes the client for the sins of the attorney. The disciplinary rules, however, were not designated to penalize the litigant; rather, their purpose is to delineate the duties an advocate in a judicial proceeding owes to his client. By denying the proper weight of King's testimony, the majority imputes King's professional indiscretions to his client.

I condemn King's practice of acting as both witness and advocate for his client. Ample justification for preventing this practice from becoming prevalent is found in the need to maintain due respect for the integrity of the legal profession, which is bound to suffer from such conduct.[3] King should be sanctioned by whatever punishment the Texas Supreme Court or our district grievance committee finds appropriate. I conclude, after careful consideration and by reflective thinking, that attorney King's conduct did not prejudice the opposing party to such an extent that it caused or probably caused the rendition of an improper verdict. *Compare* Tex.R.App.P. 81(b)(1) (judicial error).

I would not hold that the trial court abused its discretion in failing to order attorney King's withdrawal and/or by not granting Warrilow's motion for mistrial when the nature of attorney King's testimony became apparent.

I would reverse the trial court's judgment and remand the case for a new trial as set out in its premises.

---

**3.** Our Supreme Court and Court of Criminal Appeals recently adopted "The Texas Lawyer's Creed—A Mandate for Professionalism" in response to the growing practice of abuse of the legal system. These courts urge our profession to rededicate itself to the practice of law "so we can restore public confidence in our profession, faithfully serve our clients, and fulfill our responsibility to the legal system." The considerable lack of ethical judgment presented in other cases as well as this one indicates that this creed appears at a most auspicious time. *See Millhouse v. Wiesenthal,* 775 S.W.2d 626 (Tex.1989); *Cosgrove v. Grimes,* 774 S.W.2d 662 (Tex.1989). Neither justice nor our fellow man is served until the principles stated in this creed become the moral fabric that all lawyers wear throughout their personal and professional lives.