DUNCANVILLE DIAGNOSTIC CENTER, INC., Cheryl Heckard, R.T., Linda Cole, R.T., and Kenneth W. Perry, Appellants,

v.

ATLANTIC LLOYD'S INSURANCE COMPANY OF TEXAS, Appellee.

No. 11–93–120–CV.

Court of Appeals of Texas, Eastland.

May 5, 1994.

Rehearing Denied June 9, 1994.

Bob Roberts, Law Offices of Bob Roberts, Austin, Keith A. Glover, Godwin & Carlton, Dallas, for appellants.

James M. McCoy, Thomas B. Alleman, Vial, Hamilton, Koch & Knox, Les Weisbrod, Morgan & Weisbrod, Dallas, for appellee.

## OPINION

McCLOUD, Chief Justice.

At issue in this case is the applicability of two exclusions in a "commercial general liability" insurance policy. We hold that the exclusions apply and that the insurance company did not have a duty to defend under the policy.

Atlantic Lloyd's Insurance Company of Texas issued a commercial general liability policy covering Duncanville Diagnostic Center, Inc. from August 22, 1989 to August 22, 1990. On October 19, 1989, Erica Portlock was treated at the Center. She died at her home later the same day. In two different lawsuits, Erica's parents sued the Center, its president Kenneth W. Perry, and Cheryl Heckard and Linda Cole who were radiological technicians employed by the Center. Atlantic then filed the present declaratory judgment action concerning its duty to defend under its commercial general liability policy.

The trial court found that Atlantic had no duty to defend and granted Atlantic's motion for summary judgment. We affirm.[1]

To determine whether an insurer has a duty to defend its insured in a lawsuit, the allegations in the underlying suit must be considered in light of the provisions of the insurance policy. *Heyden Newport Chemical Corporation v. Southern General Insurance Company*, 387 S.W.2d 22 (Tex.1965). The allegations will be considered without reference to their truth or falsity, to what the parties know or believe to be the true facts, or to a legal determination of the true facts; and the allegations must be given a liberal interpretation, resolving all doubts in favor of the insured. *Heyden Newport Chemical Corporation v. Southern General Insurance Company, supra.* In reviewing the underlying pleadings, the court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged. *Adamo v. State Farm Lloyds Company*, 853 S.W.2d 673 (Tex.App.—Houston [14th Dist.] 1993, writ den'd); *Continental Casualty Co. v. Hall*, 761 S.W.2d 54 (Tex.

1. We will apply the well-established rules governing appellate review of summary judgments. See *Nixon v. Mr. Property Management Company*, Inc., 690 S.W.2d 546 (Tex.1985); *Gibbs v. General Motors Corporation*, 450 S.W.2d 827 (Tex. 1970).

App.—Houston [14th Dist.] 1988, writ den'd), *cert. den'd*, 495 U.S. 932, 110 S.Ct. 2174, 109 L.Ed.2d 503 (1990). Unless the Portlocks' pleadings alleged facts within the coverage of the insurance policy, Atlantic had no duty to defend appellants in the underlying lawsuits. *Fidelity & Guaranty Insurance Underwriters, Inc. v. McManus*, 633 S.W.2d 787 (Tex. 1982).

Raymond and Mary Portlock alleged a number of acts and omissions constituting negligence on the part of the Center, its president, and the two technicians: (1) the administration to Erica of an overdose of chloral hydrate, a sedative; (2) the failure to obtain a proper medical diagnosis of the overdose when Erica remained unconscious both when the tests were completed and when Mr. Portlock called the Center later that day; (3) the failure to adequately hire, train, and supervise the Center's employees; and (4) the failure to institute adequate policies and procedures at the Center.

On October 19, 1989, the Portlocks took Erica, their four-and-a-half year old daughter, to the Center for routine radiological examinations of her urinary tract, bladder, and kidneys. Cheryl Heckard and Linda Cole, two radiological technicians employed by the Center, prepared a dosage of chloral hydrate. Heckard and Cole did not properly measure the dosage and administered too much of the sedative to Erica. Erica became unconscious. The tests were performed, and the Portlocks were told to take Erica home in her unconscious state. Later that day, Mr. Portlock called the Center because he was concerned that Erica was still unconscious. Instead of conveying this information to a physician at the Center, the receptionist put Mr. Portlock on hold and spoke with a technician. The receptionist then told Mr. Portlock not to worry and that it would be normal for Erica to sleep well into the evening or into the next morning. After more time had passed without Erica's awakening, Mr. Portlock again called the Center, but no one answered the phone. Erica never awoke, and she died later that day. The medical examiner attributed Erica's death to acute chloral hydrate intoxication.

The policy contained an endorsement providing that coverage does not apply to bodily injury "due to the rendering or failure to render any professional service." Appellants argue that the pleadings in the underlying lawsuits contain allegations other than the negligent rendering of or failure to render professional services and, therefore, that Atlantic had a duty to defend them in the underlying suits.

■ The underlying petitions alleged two operative causes of Erica's death: that the radiological technologists administered to Erica a massive overdose of chloral hydrate and that the Center's employees failed to obtain a proper medical diagnosis of the fact that Erica had been given an overdose of chloral hydrate when she remained unconscious. In determining the applicability of the professional services exclusion, we first ascertain whether those activities constituted the rendering of professional services.

In *Maryland Casualty Co. v. Crazy Water Co.*, 160 S.W.2d 102 (Tex.Civ.App.—Eastland 1942, no writ), this court elaborated on the meaning of the phrase "professional services" in an insurance coverage exclusion:

The meaning of the word "profession" in the sense that "professional" is "that which pertains to a profession" (50 C.J. p. 640, § 2) may, perhaps, be best understood by mention of some prominent or characteristic elements, rather than by an attempted complete definition. It serves no useful purpose in the present inquiry to say, as truly may be said, that a profession is a vocation, calling, occupation or employment. In some sense, of course, a profession involves labor, skill, education, special knowledge and compensation or profit. The labor, as well as the skill, however, involved is predominately mental or intellectual, rather than physical or manual. The education or special knowledge involved is characterized by its use for others as distinguished from self, or as sometimes said "a practical dealing with affairs as distinguished from mere study or investigation." [2]

2. See also *Guaranty National Insurance Co. v.*      *North River Insurance Company*, 909 F.2d 133

Administering drugs as well as providing medical advice or making a medical diagnosis requires the exercise of trained medical judgment. These acts also demand the application of specialized education and knowledge. Furthermore, the skills involved in rendering these medical services are predominantly intellectual rather than physical. Clearly, Erica's death was a direct result of the rendering of or the failure to render professional medical services.

We are unpersuaded by appellants' argument that some of the allegedly negligent acts required only menial or clerical skills, such as measuring and documenting drug dosages. Appellants cite a number of cases in which courts have held that certain actions of medical personnel do not constitute the rendering of professional services.[3] We believe that those cases are either distinguishable or not persuasive.

In the present case, Erica's death is directly attributable to the allegedly negligent providing of professional medical treatment or the failure to provide such treatment, not to the negligent performance of an administrative or ministerial task. To the extent the acts involved in this case did not require the exercise of professional medical judgment, the acts were nonetheless an intricate part of the professional medical services provided by the Center and fall within the professional services exclusion. See *Alpha Therapeutic Corporation v. St. Paul Fire and Marine Insurance Company*, 890 F.2d 368 (11th Cir. 1989); *Natural Gas Pipeline Company of America v. Odom Offshore Surveys, Inc.*, 889 F.2d 633 (5th Cir.1989).

■ Appellants also argue that the allegations of negligent hiring, training, and supervision and the allegations of inadequate policies and procedures constituted allegations of negligent conduct other than the rendering of professional services and that this other negligent conduct concurrently caused Erica's death. The essence of the Portlocks' allegations is that Erica's death arose out of the failure to render proper professional medical services, which in turn arose out of negligent hiring, training, and supervision and out of the failure to establish adequate policies and procedures. Relying on several cases that apply the doctrine of concurrent causation and hold that coverage exists where two separate and independent acts or instrumentalities—one covered and the other excluded by the policy—concurrently cause an injury, appellants argue that other negligent conduct together with the rendering or failure to render professional services caused Erica's death.[4] We disagree.

The doctrine of concurrent causation does not apply to this case. There would have been no injury in this case and no basis for the Portlocks' lawsuits without the negligent rendering of professional medical treatment. Stated more specifically, Erica's death could not have resulted from the negligent hiring, training, and supervision or from the negligent failure to institute adequate policies and procedures without the negligent rendering of professional medical services. The negligent acts and omissions were not indepen-

(5th Cir.1990); *Marx v. Hartford Accident and Indemnity Company*, 183 Neb. 12, 157 N.W.2d 870 (1968); 46 C.J.S. *Insurance* § 951 (1993).

**3.** See, e.g., *Guaranty National Insurance Co. v. North River Insurance Company, supra* (failure to secure window in psychiatric patient's room); *Hirst v. St. Paul Fire & Marine Insurance Company*, 106 Idaho 792, 683 P.2d 440 (Ct.App.1984) (sexually abusing a patient); *Keepes v. Doctors Convalescent Center, Inc.*, 89 Ill.App.2d 36, 231 N.E.2d 274 (5th Dist.1967) (maid's leaving child unattended on floor); *Grant v. Touro Infirmary*, 254 La. 204, 223 So.2d 148 (1969) (miscounting sponges after surgery); *American Casualty Company v. Hartford Insurance Company*, 479 So.2d 577 (La.Ct.App.—1st Cir.1985) (instructing patient to remove clothing and to climb onto examination table); *D'Antoni v. Sara Mayo Hospital*,

144 So.2d 643 (La.Ct.App.—4th Cir.1962) (failure to raise side rail on patient's bed); *Marx v. Hartford Accident and Indemnity Company, supra* (causing explosion during routine sterilization of equipment). See also *Duke University v. St. Paul Fire and Marine Insurance Company*, 96 N.C.App. 635, 386 S.E.2d 762 *review den'd*, 326 N.C. 595, 393 S.E.2d 876 (1990) (failure to lock casters on dialysis chair).

**4.** See, e.g., *Warrilow v. Norrell*, 791 S.W.2d 515 (Tex.App.—Corpus Christi 1989, writ den'd); *Cagle v. Commercial Standard Insurance Company*, 427 S.W.2d 939 (Tex.Civ.App.—Austin 1968, no writ). See also *Guaranty National Insurance Co. v. North River Insurance Company*, 909 F.2d 133 (5th Cir.1990); *State Farm Mutual Automobile Insurance Company v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973).

dent and mutually exclusive; rather, they were related and interdependent. Therefore, the professional services exclusion operated to exclude coverage not only for the claims of negligence in rendering the professional services but also for the related allegations of negligent hiring, training, and supervision and negligent failure to establish adequate policies and procedures. See *Fidelity & Guaranty Insurance Underwriters v. McManus, supra; Centennial Insurance Company v. Hartford Accident & Indemnity Company,* 821 S.W.2d 192 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Thornhill v. Houston General Lloyds,* 802 S.W.2d 127 (Tex.App.—Fort Worth 1991, no writ). See also *Commercial Union Insurance Company v. Roberts,* 7 F.3d 86 (5th Cir.1993); *Old Republic Insurance Co. v. Comprehensive Health Care Associates, Inc.,* 2 F.3d 105 (5th Cir.1993); *Columbia Mutual Insurance Company v. Fiesta Mart, Inc.,* 987 F.2d 1124 (5th Cir.1993).

■ The commercial general liability policy also contained an exclusion for injury due to health and cosmetic services, which provided, in part, that coverage did not apply to bodily injury arising out of:

1. The rendering or failure to render:
   (a) Medical, surgical, dental, x-ray or nursing service or treatment, or ...
   (b) Any health service or treatment; or
   *   *   *   *   *   *
2. The furnishing or dispensing of drugs.

Again, in determining whether an exclusion applies, we must focus on the factual origin of the injury rather than the legal theories asserted. According to its plain language, the health and cosmetic services exclusion clearly applied to the factual circumstances surrounding Erica's death. Therefore, employing the same analysis used for the professional services exclusion, we conclude that, under the health services exclusion to the commercial general liability policy, Atlantic had no duty to defend appellants in the underlying suits.

The judgment of the trial court is affirmed.