# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===============
## NO. 03-01-00045-CV
===============


**Utica National Insurance Company of Texas/Texas Property & Casualty Insurance Guaranty Association, Appellants**

**v.**

**Texas Property & Casualty Insurance Guaranty Association and American Indemnity Company/Utica National Insurance Company of Texas, Appellees**


=================================================================
## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. 98-14026, HONORABLE F. SCOTT MCCOWN, JUDGE PRESIDING
=================================================================


Utica National Insurance Company of Texas ("Utica") appeals the judgment of the trial court declaring that Utica had a duty to defend and a duty to indemnify its policyholders and ordering Utica to pay damages on behalf of its insureds. The Texas Property & Casualty Insurance Guaranty Association ("the Association") appeals the trial court's decision to apportion Utica's defense costs on a pro rata basis and the trial court's refusal to charge additional damages to Utica based on article 21.55 of the Texas Insurance Code. Tex. Ins. Code Ann. art. 21.55 (West Supp. 2001). American Indemnity Company ("American Indemnity") joins the Association as an appellee with regard to Utica's appeal. We will affirm the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves an insurance coverage dispute arising out of an underlying personal injury lawsuit involving forty-four plaintiffs and several defendants. Mid-Cities Anesthesiology, P.A. and its member anesthesiologists (collectively "the Anesthesiology Group") were defendants. The Anesthesiology Group had obtained professional liability insurance coverage from Insurance Corporation of America ("ICA"). Additionally, the Anesthesiology Group purchased general liability insurance coverage from Utica for the period between May 18, 1991 and May 18, 1992, and from American Indemnity for the period between May 18, 1992 and May 18, 1995.

Upon the filing of the underlying lawsuit, ICA began to defend the Anesthesiology Group. During the course of providing the defense, ICA became insolvent. On April 1, 1997, the Commissioner of Insurance declared ICA to be an impaired insurer. Pursuant to the Texas Property and Casualty Insurance Guarantee Act, Tex. Ins. Code Ann. art. 21.28-C (West Supp. 2001), the Association assumed ICA's responsibilities to the Anesthesiology Group under the professional liability policy.

### A. The Underlying Lawsuit

The forty-four plaintiffs were exposed to hepatitis-C as a result of contaminated anesthesia administered to them by the Anesthesiology Group during out-patient surgeries that occurred between December 1991 and March 1992. The plaintiffs alleged that an employee of the hospital, who had previously been infected with hepatitis-C, caused the contamination in his attempts to steal drugs from the Anesthesiology Group for his personal use. The hospital employee apparently broke open sealed glass ampules of fentanyl and extracted an amount of the drug using a

2

contaminated syringe. He then replaced that amount with saline and resealed the ampules, thereby concealing his theft. The Anesthesiology Group then administered the contaminated fentanyl to its patients for surgical purposes.

The plaintiffs filed suit during the period that ICA's claims-made policy was in effect. ICA provided a defense for the Anesthesiology Group and was able to secure settlements with a number of the plaintiffs prior to ICA's insolvency. After the insolvency, the Association assumed ICA's defense obligations. Subsequently, after only four plaintiffs remained in the case and an amended petition was filed alleging additional claims implicating the general liability coverage, the Association tendered the defense of the lawsuit to American Indemnity in the Spring of 1998 and to Utica on September 8, 1998. All four of the remaining plaintiffs received the contaminated anesthesia during the time in which Utica's policy was in effect. Utica denied that it had a duty to defend or indemnify.

## B. Procedural History

Although American Indemnity originally denied it had a duty to defend, it eventually agreed to assist the Association in settling the remaining claims. The settlement costs were split evenly between the Association and American Indemnity at $525,000 each. After disposition of the underlying lawsuit, American Indemnity filed suit seeking a declaratory judgment to determine the rights and obligations of each insurance carrier and sought subrogation damages from Utica for the settlement costs paid by American Indemnity. The Association and Utica answered and filed counter and cross claims.

Each party then filed motions for summary judgment on the duty to defend issue. While still pending, American Indemnity and the Association mediated their duty-to-defend dispute and arrived at a settlement. Utica's summary judgment motion on that issue was subsequently denied. Following that ruling, American Indemnity and the Association shifted their attention to whether Utica had a duty to indemnify. After considering all motions, the district court declared that Utica had both a duty to defend and a duty to indemnify. The court further found Utica to have breached both duties. Utica was ordered to pay $45,983.38 in defense costs to the Association along with pre-judgment interest in the amount of $9,234.47. Due to its failure to pay damages on behalf of its insured, Utica was ordered to pay $525,000, plus $105,431.49 in pre-judgment interest, to each the Association and American Indemnity. Finally, Utica was ordered to pay all attorney's fees. Post-judgment interest was also awarded.

## DISCUSSION

Both Utica and the Association appeal to this Court. Utica claims that it did not owe a duty to defend nor a duty to indemnify. The Association counters that, not only did Utica have a duty to defend, it is not entitled to a pro rata reduction of its defense costs. The Association also claims that Utica owes additional damages based on article 21.55 of the Texas Insurance Code. We will first address the issues raised by Utica and then those put forth by the Association.

### A. Utica's Appeal

The duty to defend and the duty to indemnify by an insurer are distinct and separate duties. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997). The construction

4

of an insurance policy is a question of law for the court to determine. *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983); *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). Insurance policies are to be strictly construed in favor of the insured in order to avoid exclusion of coverage. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).

An insurer's duty to defend is determined by the allegations in the pleadings and the language of the insurance policy. *See National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997); *Cowan*, 945 S.W.2d at 821; *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 847-48 (Tex. 1994). This is known as the "eight corners" rule.[1] *See Merchants Fast Motor Lines*, 939 S.W.2d at 141. In applying the eight corners rule, we give the allegations in the petition a liberal interpretation. As the supreme court has explained:

> Where the complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy. Stated differently, in case of doubt as to whether or not the allegations of a complaint against the insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will be resolved in the insured's favor.

*Id.* (quoting *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex. 1965)). In reviewing the underlying pleadings, this Court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged. *See id.*; *Adamo v. State Farm Lloyds Co.*, 853 S.W.2d 673, 676 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ("It

---

[1] The "eight corners" rule is also sometimes called the "complaint allegation" rule. *See Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997); *Garcia*, 876 S.W.2d at 847-48.

is not the cause of action alleged that determines coverage but the facts giving rise to the alleged actionable conduct."). The factual allegations against the insured should be considered in light of the policy provisions without reference to their truth or falsity and without reference to what the parties know or believe to be the true facts. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex. 1973). The court may not read facts into the pleadings, may not look outside the pleadings, and may not "imagine factual scenarios which might trigger coverage." *Merchants Fast Motor Lines*, 939 S.W.2d at 142.

An examination of the pleadings in this case shows numerous acts and omissions by the Anesthesiology Group that allegedly caused the plaintiffs' injuries. For organizational purposes, we will follow Utica's summary of the allegations into three sub-groups containing (a) twenty-one antecedent acts, (b) a single injury-causing act (the administering of the contaminated fentanyl), and (c) five subsequent acts. The eight corners rule requires us to examine every factual allegation in the pleadings to determine whether Utica had a duty to defend. Although Utica chooses to focus on the administering of the fentanyl, the eight-corners rule requires us to examine all twenty-seven acts. The rule calls for a liberal, rather than constrictive, interpretation of the pleadings. *See St. Paul Ins. Co. v. Texas Dep't of Transp.*, 999 S.W.2d 881, 884 (Tex. App.—Austin 1999, pet. denied).

The factual allegations showing the origin of damages include such antecedent acts as failing to properly secure anesthesia narcotics, violating statutory and regulatory standards pertaining to the handling and storage of narcotics, failing to maintain narcotics in a securely locked cabinet, failing to ensure adequate policies to prevent drug contamination, and leaving controlled

6

substances unattended in the operating room. These antecedent allegations of negligence appear to be sufficient to trigger coverage and a duty to defend under the Utica policy.

Utica, however, responds that no coverage is provided by its policy because of the following professional services exclusion that it contends eliminates both its duty to defend and its duty to indemnify:

> This insurance does not apply to: . . . "Bodily injury," "property damage," "personal injury" or "advertising injury" due to rendering or failure to render any professional service. This includes but is not limited to: . . . (4) Medical, surgical, dental, x-ray, or nursing services or treatment; (5) Any health service or treatment; . . . (9) Services in the practice of pharmacy . . . .

"[E]xceptions or limitations on liability are strictly construed against the insurer and in favor of the insured." *National Union Fire Ins. Co. v. Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex. 1991). Accordingly, we must interpret the exclusion in a manner that favors coverage. If a party urges a reasonable construction of an exclusion that allows for coverage, the courts must adopt that construction. *See Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998).

Utica claims the exclusion applies because the injuries to the plaintiffs occurred as a direct result of the administration of anesthesia during surgery. Utica's position attempts to concentrate each allegation in the pleadings around the administration of surgical anesthesia. Utica contends that every act is "related and interdependent" to the surgical treatment. Utica asserts that its professional services exclusion precludes coverage if any connection exists between the injuries suffered and the provision of professional services. Utica further contends that the rendition of surgical services need only be a but-for cause or cause-in-fact of the injuries and not approximate or

7

legal cause. In our view, Utica's construction of its policy broadens the application of the exclusion more than the case law permits. *See Hudson Energy*, 811 S.W.2d at 555.

Utica cites four cases in support of its argument. *See Commercial Union Ins. Co. v. Roberts*, 7 F.3d 86 (5th Cir. 1993); *Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761 (5th Cir. 1999); *Duncanville Diagnostic Ctr., Inc. v. Atlantic Lloyd's Ins. Co.*, 875 S.W.2d 788 (Tex. App.—Eastland 1994, writ denied); *Burlington Ins. Co. v. Mexican Am. Unity Council, Inc.*, 905 S.W.2d 359 (Tex. App.—San Antonio 1995, no writ). Only one of the cited cases deals with a professional services exclusion and is factually similar enough to our case to be persuasive. *See Duncanville*, 875 S.W.2d 788.

Duncanville, the insured, provided diagnostic health services. During the course of an examination, a patient was given an overdose of a sedative, rendering her unconscious and ultimately resulting in her death. The underlying lawsuit alleged negligence in administering the sedative, improperly hiring and training the technicians who administered the drugs, and failure to take proper subsequent measures. The insured's general liability policy contained a professional services exclusion. The insured attempted to avoid the exclusion by arguing that the injury resulted from concurrent causation. The appellate court expressly rejected this argument because the injury could only have resulted from the administration of the sedative. *Id.* at 791. Negligently hiring and improperly training the technicians responsible for sedating patients could not, the court concluded, have been independent and mutually exclusive; all acts were held to be related and interdependent to the professional services rendered, and as a result, the exclusion applied and coverage was denied. *Id.* at 792.

8

The Association responds that the plaintiffs' injuries cannot be reduced solely to the contaminated fentanyl injection because multiple occurrences independently contributed to the plaintiffs' injuries. In support of this position the Association cites two cases. *See Guaranty Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133 (5th Cir. 1990); *Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548 (5th Cir. 2000).[2] Although both cases discuss the application of a professional services exclusion, only one involves a health care provider and is sufficiently similar to our case to be persuasive. *See Guaranty National*, 909 F.2d 133.

In *Guaranty National*, the insured was a hospital who was sued after a psychiatric patient jumped to her death from her fourth floor window.[3] The general liability carrier denied coverage based upon its professional services exclusion. The appellate court expressly rejected a broad interpretation of the exclusion, instead choosing to narrowly interpret the "exclusion to avoid coverage only for actions taken on behalf of a patient that are based on professional, medical judgment." *Id.* at 135-36. Since the hospital was sued due to its failure to maintain the windows in a safe manner—an administrative or ministerial duty—professional training, skill, or judgment was not involved. Thus, the appellate court held the exclusion to be inapplicable. *Id.* at 138.

After a review of the authority cited by the parties, we are convinced that *Guaranty National* is the most persuasive case on point. There, the hospital was charged with negligence in

---

[2] Federal precedent is not binding on this Court; it is only persuasive. *See Sutphin v. Tom Arnold Drilling Contractor, Inc.*, 17 S.W.3d 765, 771 (Tex. App.—Austin 2000, no pet.).

[3] The hospital was instructed to admit the patient to a "closed" unit. In a "closed" unit, access is restricted and the windows have screens that are designed to prevent escape. The hospital chose to admit the patient to a less secure "open" unit because the closed unit was full at the time of admittance. The open units had windows that were not screened.

performing acts that did not involve the use of professional skill, training, or judgment. The acts complained of were administrative and ministerial. Because the allegations focused on the manner in which the windows were secured, not the manner in which the patient was diagnosed or treated, the services complained of were unrelated to and independent of the professional services offered by the hospital. Therefore, the professional services exclusion did not apply.

Similarly, the petition here alleged negligence in a number of acts that did not require any professional judgment, education, or training. Each antecedent act required custodial, administrative, or ministerial skills. For example, the Anesthesiology Group's professional training, education, and expertise were not required to properly store its drugs and screen the people with access to them. These acts relate to security and custodial duties associated with the lawful possession of controlled substances. Accordingly, we conclude that the professional services exclusion does not apply to those antecedent acts that are independent of professional training, education, and expertise.

Finally, Utica claims that coverage is precluded by its definition of "occurrence," which "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Utica argues that the plaintiffs' injuries were not an accident because the contamination was the result of an intentional act. This argument lacks merit. While the contamination occurred as a result of intentional conduct, the actor was not employed by the Anesthesiology Group; the hospital employee's willful conduct cannot be imputed to the Group. Furthermore, the petition alleged negligence. The pleadings did not claim that the Anesthesiology Group *intentionally* failed in its custodial duties. Because Utica cannot show that the injuries

10

resulting from the Anesthesiology Group's acts were intentional, we hold that the "occurrence" requirement has been satisfied.

## B. The Association's Cross-Appeal

The Association raises two issues in its cross-appeal. It first claims the trial court erred in granting a pro rata reduction in the amount of defense costs Utica was ordered to pay. "[T]his Court has held that an insurer's duty to indemnify its insured is not reduced when there is concurrent coverage among consecutive insurers, because there is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period." *Texas Prop. & Cas. Ins. Guar. Assoc. v. Southwest Aggregates, Inc.*, 982 S.W.2d 600, 605 (Tex. App.—Austin 1998, no pet.). The same rules apply to the duty to defend. *Id*. When multiple policies apply to a loss, the "other insurance" provisions in insurance contracts determine how liability is to be apportioned between insurers, but this provision does not affect the relationship between the insurer and the insured. *Id.* at 606.

The Association relies on *Southwest Aggregates* for the proposition that an insurer's duty to defend cannot be reduced pro rata by the insurer's "time on the risk" or any other formula. *Id*. at 607. In *Southwest Aggregates*, we held that an insured must exhaust the limits of its policies if one or more of its insurers remained solvent and unimpaired. Only after such exhaustion may an insured seek a defense and indemnification from the Association. That case involved two insurers, one of which had been declared an impaired insurer. Therefore, we held that the remaining insurer's relationship with its insured was such that the insurer owed a complete defense. The remaining insurer was not allowed to provide a pro rata defense simply because the insured had obtained

11

coverage from other insurers. Furthermore, the Association was not required to "bail-out" the insured until it had exhausted the policy limits as provided by the remaining solvent insurer.

The case currently before us involves three insurers. Only one has been declared an impaired insurer. Therefore, the remaining two insurers each have a duty to provide a complete defense. However, neither must pay all of the defense costs because they share the duty until one has either exhausted its policy limits or is declared impaired. We follow our holding in *Southwest Aggregates* and hold that the Association should not bear the defense costs if a solvent insurer owes a duty to defend. However, we cannot say the trial court abused its discretion in awarding attorney's fees pro rata because multiple insurers remain solvent and both share the duty to defend. The Association's first point of error is overruled.

In its second point of error, the Association complains of the trial court's refusal to award the Association damages under article 21.55 of the Texas Insurance Code.[4] Article 21.55 defines a "claim" as a "first party claim made by an insured or a policyholder." Tex. Ins. Code Ann. art. 21.55, § 1(3). The Association stepped into the shoes of ICA, an insurer. Therefore, any claims

---

[4] The damages section of the article provides:

> In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable to pay the holder of the policy, or the beneficiary making a claim under the policy, in addition to the amount of the claim, 18 percent per annum of the amount of such claim as damages, together with reasonable attorney fees. If suit is filed, such attorney fees shall be taxed as part of the costs in the case.

Tex. Ins. Code Ann. art. 21.55, § 6 (West Supp. 2001).

12

made by the Association against Utica are third-party claims and do not fall within the statutory definition of a claim. Accordingly, the judgment of the trial court on this issue is affirmed.

## CONCLUSION

Having found that Utica owed the Anesthesiology Group a duty to defend and a duty to indemnify, we hold that the trial court's declaration and order are proper. Furthermore, having found that the trial court properly reduced Utica's defense costs pro rata and refused to assess additional damages under the Insurance Code, we affirm the judgment of the trial court in its entirety.

_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Patterson

Affirmed

Filed:  October 25, 2001

Do Not Publish