United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 11, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-20050
Summary Calendar

LEXINGTON INS. CO.,

Plaintiff - Counter-Defendant -
Appellee - Cross-Appellant,

versus

EDUCARE COMMUNITY LIVING CORP.-GULF COAST, ET AL,

Defendants,

EDUCARE COMMUNITY LIVING CORP.-GULF COAST,

Defendant - Counter-Claimant -
Appellant - Cross-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. H-02-2822

----------------------------

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendant, Educare Community Living Corporation–Gulf Coast
("Educare") appeals the summary judgment in favor of Plaintiff,
Lexington Insurance Company ("Lexington"), the judgment declaring
that Lexington has no duty to indemnify Educare for the remaining
$1,500,000 that Educare paid in partial fulfillment of a settlement

---

[*] Pursuant to the 5TH CIR. R. 47.5, the court has determined that this
opinion should not be published and is not precedent except under limited
circumstances set forth in 5TH CIR. R. 47.5.4.

1

agreement. Lexington cross-appeals the denial of attorney's fees.

Educare was sued as a result of one of its employee's alleged sexual assault of a resident in an Educare group home. Educare Employees DeLaCerda and Elvenia Hackett were implicated in claims for negligent hiring and negligent supervision and training. The parties settled the underlying lawsuit, Lexington contributing $1,000,000 to the settlement in accordance with the primary policy's maximum commercial general liability coverage. However, the primary policy contained two coverage parts: commercial general liability ("CGL") and medical professional liability ("MPL"). Pursuant to the MPL coverage of the primary policy and to a non-waiver, reservation of rights agreement entered into between Educare and Lexington prior to the settlement, Educare seeks indemnification for the amount it paid in satisfaction of the settlement agreement. The crucial question on appeal, therefore, is whether the negligent supervision claim in the underlying lawsuit falls within the MPL coverage included in the primary policy, requiring Lexington to indemnify Educare for the additional $1,500,000 that Educare paid in settlement. Additionally, Lexington appeals the denial of attorney's fees.

I.

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment

2

as a matter of law.[1]  Under FED.R.CIV.P. 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[2]  When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.[3] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[4]  In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant.[5]  This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court.[6]

Texas rules of contract interpretation control in this diversity case concerning disputed language in an insurance policy.[7]  In a coverage dispute, the primary concern of the court

---

[1]  *See* Fed. R. Civ. P. 56.

[2]  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[3]  *See* Prejean v. Foster, 227 F.3d 504, 508 (5th Cir. 2000).

[4]  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986).

[5]  *Id*. at 255; Cabillo v. Cavender oldsmobile, Inc., 288 F.3d 721, 725 (5th Cir. 2002).

[6]  Boudreaux v. Swift Transp. Co., Inc., 402 F.3d 536, 540 (5th Cir. 2005).

[7]  Am. Nat'l Gen. Ins. Co. v. Ryan, 274 F.3d 319, 323 (5th Cir 2001).

3

is to give effect to the intentions of the parties as expressed by the policy language.[8] The court gives the terms used in the policy their plain, ordinary meaning unless the policy itself shows that the parties intended the terms to have a different, technical meaning.[9] The court must "consider the policy as a whole and interpret it to fulfill [the] reasonable expectations of the parties in light of customs and uses of the industry."[10] When considered as a whole, a contract is ambiguous only if "it is reasonably susceptible to more than one meaning."[11] Although a court will construe ambiguities in an insurance contract against the insurer and in favor of coverage, "not every difference in the interpretation of a contract or an insurance policy amounts to an ambiguity."[12]

A.

The language of the insurance policy is clear. The MPL covered amounts that Educare become legally obligated to pay as "damages resulting from a medical incident arising out of professional services." The MPL defined a "medical incident" as "any act, error or omission in the providing of or failure to

---

[8] Ideal Lease Serv., Inc. v. Amoco Prod. Co., 662 S.W.2d 951, 953 (Tex. 1983).

[9] Puckett v. U.S. Fire Ins. CO., 678 S.W.2d 936 (Tex. 1984).

[10] N. Am. Shipbuilding, Inc. v. S. Marine & Aviation Underwriting, Inc., 930 S.W.2d 829, 834 (Tex. Ct. App. 1996).

[11] Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).

[12] Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994).

4

provide professional services."[13]   The MPL defined "professional

services" as follows:

>1.   Medical, surgical, dental, nursing or other
>health care services including but not limited to
>the furnishing of food or beverages in connection
>with such services; the practice of nuclear
>medicine; the furnishing or dispensing of drugs or
>medical, dental or surgical supplies or appliances;
>or the handling or treatment of deceased human
>bodies, including autopsies, organ donation or
>other procedures;
>
>2.   Services by any person as a member of a formal
>accreditation, standards review or similar
>professional board or committee of any Insured; or
>
>3.   Supervising, teaching, proctoring others at
>your request.

On appeal, Educare argues that the negligent training

and supervision of its employee qualifies as falling within

the "supervising, teaching, and proctoring" prong of the

professional services definition, resulting in coverage

under the MPL.  This assertion, however, wholly removes the

phrase from the list in which it is enumerated and from the

context which that list provides--namely, professional

healthcare.  The very title of the coverage, "Medical

Professional Liability," suggests that coverage depends on

providing professional medical care.  All of the examples

of services enumerated in part 1 of the definition require

---

[13]   Additionally, the MPL provisions excluded coverage "for any actual, alleged, attempted, or proposed erotic physical contact, or any sexual abuse or harassment" and contained a "separation of insureds" clause.  The primary policy limited insurance to $1,000,000 per "each medical incident."

5

some specialized education or experience. Furthermore, part 2 requires some special accreditation. Though urging a broad interpretation of the language "other health care services" found in part 1, Educare does not argue that the relevant employees are covered by parts 1 or 2 of the definition. If we were to accept Educare's view of coverage under part 3, all of Educare's employees, simply by virtue of being trained or supervised in a group home environment, would qualify for coverage under the MPL part of the policy, irrespective of the employee's level of participation in providing healthcare. This cannot be true.

Interpreting the policy as a whole, it is clear that the MPL excludes the training and supervision of an employee not possessing the type of skills set forth in parts 1 or 2 of the definition. After all, this is the purpose of MPL coverage, to supplement non-professional CGL coverage.[14] Therefore, when read in context, the supervision and teaching must be for healthcare services-- professional in nature--demanding either specialized knowledge, such as that required to perform the enumerated tasks in part 1, or recognized training, such as that

---

[14] Cochran v. B.J. Services Co. USA, 302 F.3d 499, 502 (5th Cir. 2002) (stating "[i]nsured professionals, such as engineers...ordinarily carry special insurance separate from the CGL policy to cover obligations arising from the rendering of professional services").

6

required by part 2.  In affirmation, this court previously has interpreted a coverage exclusion for supervisory activities contained within a detailed definition for professional services to require specialized training.[15]

Moreover, when not expressly defined in such a way that purports to vary the customary usage of the term, the accepted meaning of professional services, according to both Fifth Circuit and Texas state law, conforms to this interpretation of the professional services definition in the present case.  This Court has defined professional healthcare services as not "a purely physical action in response to a business determination, but rather the exercise of a trained judgment in obedience to an established medical policy."[16]  Likewise, Texas courts define "professional services" as requiring specialized education and knowledge.[17]  These customary definitions do

---

[15]  *Id*.  In an appeal from the Western District of Louisiana, a supervisory exclusion within the definition of professional services was deemed not to preclude coverage where an insured was injured merely by removing a cement head from an oil rig because the nature of the work did not constitute a professional service, which would require "special insurance." The policy defined professional services as: "1. The preparing, approving, or failure to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and 2. Supervisory, inspection, architectural, or engineering activities."  *Id*.

[16]  Big Town Nursing Homes v. Reserve Ins. Co., 492 F.2d 523, 525 (5th Cir. 1974); Guaranty Nat'l Ins. Co. v. North River Ins. Co., 909 F.2d 133, 137 (5th Cir. 1990) (applying same definition).

[17]  Duncanville Diagnostic Ctr. v. Atlantic Lloyd's Ins. Co., 875 S.W.2d 788, 790-91 (Tex.App.-Eastland 1994), reh'g denied (Though holding that a professional services exclusion from coverage in a CGL policy was inapplicable to a radiological technician who administered a lethal dose of a chemical to a

7

not singularly inform but, rather, stand to buttress the conclusion that the parties contracted for coverage related to professional medical treatment.

B.

The record demonstrates that the training of and supervision by the Educare employees named in the underlying lawsuit did not involve professional services as defined by the instrument, thereby precluding coverage under the MPL part of the insurance policy.[18] Neither DeLaCerda nor his supervisor Elvenia Hackett had any specialized medical education or experience. DeLaCerda was hired as a night-time "program technician," a position that required a high school diploma or equivalent, a valid driver's license with an acceptable driving record, and a demonstration of competency on the one-week new employee orientation that included a thirty-minute introduction to mental retardation. No state license was required. The program administrator for Educare described the night-shift program technician's duties as typically not involving

_____

patient, *Duncanville* limited "professional services" to those applying specialized education and knowledge, as well as predominantly intellectual rather than physical skills.).

[18] The *Duncanville* lawsuit included claims of negligence, as well as the failure to adequately hire, train, and supervise the medical center's employees and the failure to institute adequate policies and procedures at the center. *See Duncanville Diagnostic Ctr.*, 875 S.W.2d at 788. The court determined that without the rendering of negligent medical services, the other negligence claims could not follow. *Id*.

8

resident contact, except in the case of emergency.[19] The job required cleaning and home maintenance duties and visually verifying that the residents were sleeping safely. Moreover, DeLaCerda was not allowed to perform medical tasks or even hand a pill to a resident; therefore, he was not even remotely involved in administering any type of professional medical care. The evidence on record does not create a question of fact; DeLaCerda's employment duties with Edurcare did not qualify as "professional services" as defined in the insurance policy.

The claims against Educare in the underlying litigation also alleged the negligent supervision and training of DeLaCerda's supervisor Elvenia Hackett. Hackett, a residential director, obtained a G.E.D. and had attended both a business program and a cosmetology school prior to her employment with Educare. In addition to the same one-week orientation that DeLaCerda attended, she also received one week of on-the-job training, which included sitting in on interviews and familiarization with the

---

[19] Duncanville Diagnostic Ctr., 875 S.W.2d at 790-91 (Though actual diagnosis of medical conditions certainly rises to the level of professional service, "to the extent the acts involved in this case did not require the exercise of professional medical judgment, the acts were nonetheless an intricate part of the professional medical services provided by the Center."); Employers Reins. Corp. v. Newcap Ins. Co., 209 F.Supp.2d 1184, 1197-98 (D.Kan. 2002) (distinguishing *Duncanville*, stating that security guards who enforced hospital policy by calling a dispatcher upon recognizing a health emergency were not intimately involved in providing health care services).

9

paperwork involved in the administration of a group home.[20]
Hackett was responsible for the grocery and household
supply shopping, for staffing, and for interacting with the
residents' guardians. She was not, however, allowed to
perform any medical tasks, such as distributing medication
to a resident. Thus, Hackett was not responsible for
providing professional services.

The record before this Court, viewed in light most
favorable to Educare, does not raise a genuine issue of
material facts regarding DeLaCerda and Hackett's provision
of professional services as required by the MPL part of the
insurance policy. We agree with the district court that
Educare is not entitled to indemnification for the
additional $1,500,000 it paid in satisfaction of the
settlement agreement.[21]


## II.

Lexington also cross-appeals the district court's
rejection of its claim for attorney's fees under its
written agreement with Educare.

---

[20] *See* Big Town Nursing Homes, 492 F.2d, 525 (recognizing a distinction between medical and administrative activities for the purposes of distinguishing between professional and non-professional services but concluding that the facts of the case did not support a finding that a nurse's restraining of a patient constituted administrative activity).

[21] Consequently, we do not reach other arguments against coverage raised by Lexington.

Again, this court reviews a grant of summary judgment *de novo*, applying the same standard as the district court.[22] Of course, state law governs construction of the agreement.[23] For diversity cases, attorney's fees awards are also governed by state law.[24]

Lexington and Educare entered into an agreement preserving rights and possibly for reimbursement. Two separate paragraphs provided for recovery of fees in litigation in the event of any overpayment during settlement. Paragraph five provided that any party funding more than its share of the settlement would be reimbursed with interest and reasonable attorney's fees. Paragraph nine provided that "[t]he successful party shall be entitled to recover its reasonable and necessary attorney's fees incurred in connection with this coverage dispute between the Parties incurred from the effective date of this agreement through final resolution." The agreement did not define the term "successful party."

Again, extricating a single clause from the whole instrument, Lexington now argues that it is the successful

---

[22] Boudreaux, 402 F.3d at 540.

[23] *See* Lockette v. Greyhound Lines, Inc., 817 F.2d 1182, 1185 (5th Cir. 1987).

[24] Texas Commerce Bank Nat'l Ass'n v. Capital Bancshares, Inc., 907 F.2d 1571, 1575 (5th Cir. 1990).

11

party under paragraph nine and is, therefore, entitled to attorney's fees. However, the instrument, as read in its entirety, requires that the successful party prevail in an action for reimbursement of funds paid in excess of its share. Paragraph nine states that "[t]he successful party shall...recover...attorney's fees incurred in connection with *this* coverage dispute"–-not in connection with any coverage dispute (emphasis added). Lexington did not overpay in the present case and is not entitled to any reimbursement pursuant to the non-waiver agreement. Therefore, as the district court concluded, attorney's fees cannot be sustained by the non-waiver agreement.

AFFIRMED